United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 28, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-70024

GILBERTO REYES,

Petitioner - Appellant,

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
for the Northern District of Texas, Lubbock
USDC No. 5:03-CV-00186

Before JONES, Chief Judge, and BARKSDALE and PRADO, Circuit
Judges.

PER CURIAM:[*]

Petitioner Gilberto Reyes was convicted in Texas of capital

murder and sentenced to death. Reyes now seeks a certificate of

appealability ("COA") from this Court to appeal the district

court's denial of his petition for habeas corpus relief. He

contends that reasonable jurists could debate that his Sixth and

Fourteenth Amendment rights to the effective assistance of counsel

were not violated by his trial counsel's failure to investigate and

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

to present significant mitigating evidence, including, but not limited to, evidence that he sustained substantial abuse as a child. Because the district court's conclusion that Reyes cannot make a substantial showing of the denial of a constitutional right is not debatable among reasonable jurists, we DENY his application for a COA. We also find that the district court did not abuse its discretion by not holding an evidentiary hearing on Reyes's ineffective assistance of counsel ("IAC") claim.

## I. BACKGROUND

A summary of the facts as recounted by the Texas Court of Criminal Appeals and adopted by the district court will suffice:

Reyes dated Yvette Barraz for approximately eight months before their relationship ended in January 1998. At around 6:00 p.m. on March 11, 1998, Barraz left her parents' house for her job as a waitress at Leal's Restaurant ("Leal's") in Muleshoe, Texas. At trial, Yolanda Jaramillo, Barraz's co-worker, testified that Barraz left Leal's before she did, and that Barraz's silver/gray, 1996 Mitsubishi Eclipse was not in the parking lot when she left the restaurant.

Reyes arrived at his cousin's home in Pecos, Texas at approximately 11:45 p.m. on March 11, 1998. He asked Natividad Ovalle, Jr., his cousin's husband, how to get to Ojinaga, Mexico. Ovalle testified that when Reyes left the home, he observed Reyes drive away in a small gray car.

Between 3:30 a.m. and 4:00 a.m. on March 12, officers at the border check point in Presidio, Texas observed Reyes walking on the highway heading towards Mexico. The officers stopped Reyes and asked him to empty his pockets. Among Reyes's possessions were a couple of sets of keys, a large amount of currency in one-dollar bills and five-dollar bills, and a couple of handfuls of change. Reyes explained to the officers that one of the keys was the key to his girlfriend's car. Once a records check revealed that Reyes was not involved in a string of burglaries in Presidio that had the officers on heightened alert, Reyes was permitted to cross the bridge into Mexico.

On March 12, because Barraz failed to return home, her parents called the police. Upon receiving the call, police officers went to the parking lot at Leal's where they discovered blood and loose change on the ground.

On March 13, 1998, the Presidio County Sheriff's Office received a teletype informing them that Reyes was connected to a missing person and that it was possible that he used a gray 1996 Mitsubishi to get to Presidio. Presidio Sheriff's Officers found Barraz's car parked behind a store in Presidio located about a half of a mile from the border. They found Barraz's body in the hatchback area of the vehicle under some articles of clothing. Her pants and underwear were pulled down to her knees, and she had multiple head wounds and a laceration on one of the fingers of her left hand. Officers found a knife on the back floorboard of the

-3-

car and a claw hammer on the passenger side between the seat and the edge of the door rail. Sergeant Dusty McCord, a Sergeant with the Texas Ranger Division of the Department of Public Safety, testified that he saw bloodstains on the passenger-side seat belt and blood pooling in the hatchback area and on the floorboard behind the passenger seat.

Reyes was arrested in Portales, New Mexico, on June 7, 1998. Among his possessions were keys that matched the locks to Barraz's residence and vehicle.

Javier Flores, a forensic serologist for the Texas Department of Public Safety Laboratory, performed DNA testing on the evidence collected from Barraz's car and the parking lot at Leal's. Flores testified that Barraz's DNA matched the bloodstains in the parking lot at Leal's, inside the vehicle, and on the claw hammer. Flores also testified that Reyes's DNA matched a semen stain on Barraz's underwear with an accuracy level of one in less than 5.7 billion.

Glen Groben, the deputy medical examiner who performed an autopsy on Barraz, testified that Barraz had six separate blunt force injury wounds to her head that were consistent with being struck by a claw hammer. Although Groben found that Barraz's death was caused by blunt force trauma to the head, he also noted that there was evidence of strangulation. Groben determined that Barraz was alive when she was strangled and beaten, and that she had been sexually assaulted at or near the time of death. Based on a crime scene photograph of Leal's, Groben testified that while

-4-

it appeared that Barraz was initially injured in the restaurant's parking lot, there was not enough blood in the parking lot to suggest that she died there.

The court appointed counsel to represent Reyes at trial and during the punishment proceeding. On January 31, 2000, a jury found Reyes guilty of murdering Barraz while in the course of kidnaping her, in violation of TEX. PENAL CODE § 19.03(a)(2).

During the punishment stage, the prosecution called eight witnesses. Evidence from these witnesses demonstrated that Reyes was charged with driving while intoxicated and aggravated assault with a deadly weapon on February 9, 1998, after an individual who observed someone shoot at a car with a rifle called the Muleshoe police. Reyes was also observed chasing Barraz and her sister into their parents' home. The investigating officer found Reyes with a rifle in his truck and bullets in his pocket.

Evidence also demonstrated that Reyes was a member of the 8th Street Posse, a "social club" that sometimes engaged in fights with another "social club." Reyes was charged with aggravated assault and placed on deferred adjudication supervision for driving a truck over a curb and into Robert Rodriguez, a member of a "social club" in Muleshoe. Because he was subsequently charged with driving while intoxicated, Reyes's deferred adjudication was revoked, and he was sent to a state, military-style boot camp program.

Finally, Dr. Gripon, a psychiatrist, testified that he believed Reyes to be a continuing threat to society because Reyes's

behavior had increased in its progression towards violence, he had been involved in gang-related activity, and he had abused substances.

During the punishment phase, Reyes's trial counsel presented nine witnesses: Hector Arzola, Margie Lopez, Don Carter, Nicky Chavez, Maria Reyes, Nora Gonzales, Chris Ramos, Jesse Reyes, and Dr. Walter Quijano. Arzola, Lopez, and Carter were called to rebut evidence against Petitioner regarding an aggravated assault charge. Maria Reyes and Jesse Reyes testified that Petitioner supported his family after his father died, Barraz abused Petitioner, and Petitioner often took care of Barraz's daughter. Nicky Chavez, Chris Ramos, and Nora Gonzales testified that Petitioner was a hard worker and a good employee. Lastly, Dr. Quijano testified that Reyes would not be a continuing threat or a future danger to society. Following the punishment hearing, the jury answered the punishment special issue regarding Reyes's future dangerousness affirmatively, and it answered the punishment special issue regarding mitigating evidence negatively. *See* TEX. CODE CRIM. PROC. art. 37.071 § 2. Consequently, on February 2, the trial court sentenced Reyes to death.

The court appointed an attorney to represent Reyes on direct appeal. The Texas Court of Criminal Appeals denied relief and affirmed Reyes's conviction and sentence. *Reyes v. State*, 84 S.W.3d 633 (Tex. Crim. App. 2002).

While Reyes did not file a petition for a writ of certiorari to the United States Supreme Court, during the pendency of his direct appeal, he filed an application for a writ of habeas corpus with the state habeas court. Reyes's new court appointed attorney argued that, *inter alia*, Reyes was deprived of his Sixth and Fourteenth Amendment rights because his trial counsel failed to adequately investigate and present mitigating evidence at trial. On October 9, 2002, the Texas Court of Criminal Appeals adopted the trial court's recommendation to deny relief. *Ex parte Reyes*, No. 52,801-01 (Tex. Crim. App. Oct. 9, 2002).

Reyes filed his original petition for a writ of habeas corpus in federal district court on September 19, 2003. He argued, *inter alia*, that he was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments because trial counsel failed to investigate and/or present mitigating evidence at trial.

In the district court, Reyes presented affidavits from two investigators, two attorneys, and four witnesses who testified in the state habeas court. The district court acknowledged that those affidavits include the following information which Reyes claimed should have been presented as mitigating evidence:

Michael Ward, a licensed private investigator hired by state habeas counsel to assist in the investigation for Reyes's trial, stated that he contacted Vince Gonzales who relayed that Gonzales

had been contacted by trial counsel to conduct a mitigation investigation after trial had commenced. He also corroborated Gonzales's statement that trial counsel worked the case alone.

Alexander Calhoun, an attorney, stated that in his professional opinion an attorney in a capital murder trial is derelict in his duties if he waits until after trial has started to begin conducting a mitigation investigation.

Nicky Chavez stated that although she testified at trial, she was not contacted until after trial started. She stated that neither trial counsel nor the investigator discussed her testimony with her before she testified. She also stated that Reyes's mother neglected her children, often left them unsupervised, did not clean the family's house, and did not ensure that the children were clean. Chavez also said that Reyes was one of her husband's trusted employees, Reyes provided for his family after his father's death, and that she did not believe that he would commit a violent crime in the future.

Lenny Pineda stated that Reyes provided for his family after his father's death, Reyes's mother neglected her home and her children, Reyes's mother was emotionally abusive towards him, and that Barraz "played around" on Reyes. He also stated that while he was present at the incident involving Robert Rodriguez, Reyes's brother was not present and that the incident did not involve yelling or threats. Lastly, Pineda affirmed that while he was told that there was a subpoena for him, he was never contacted by anyone

-8-

from Reyes's defense team.

Chris Ramos stated that although he testified at trial, defense counsel spent about ten minutes with him before he testified and never asked him about Reyes's family or childhood. He observed Reyes's mother neglect the home and the family, call Reyes names, and otherwise emotionally abuse Reyes. He also stated that Barraz and Reyes had a bad relationship, and that Barraz used Reyes for money.

Ismael Reyes, Reyes's brother, stated that he was never contacted by any of his brother's attorneys. He stated that he and his brother began inhaling gasoline, freon, and paint almost daily when they were fifteen years old. Ismael Reyes stated that his brother had been hit in the head several times and was abusing cocaine daily right before murdering Barraz. He also stated that Barraz treated his brother poorly and had hit Reyes in the face.

Lisa Milstein, a private investigator retained by Reyes's state habeas counsel, stated that she interviewed Reyes's brothers, Ismael and Marcos, Reyes's mother, Maria, and Nicky Chavez. She also stated that she interviewed several jurors who stated that they did not learn anything about Reyes or why he would have killed Barraz.

The district court denied habeas relief and refused to issue a COA. This application for a COA followed. Reyes now asks this Court to grant a COA on the issue of whether his trial counsel's failure to investigate and present mitigating evidence deprived him

of effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. He also claims that the district court erred in not holding an evidentiary hearing on his IAC claim.

## II. DISCUSSION

### A. Standard of Review

Reyes's habeas claim is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), because he filed his original habeas petition under 28 U.S.C. § 2254 on September 19, 2003, after AEDPA's April 24, 1996 effective date. *See Fisher v. Johnson*, 174 F.3d 710, 711 (5th Cir. 1999) (citing *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). Under the AEDPA, a state habeas petitioner may appeal a district court's denial of habeas relief only if the district court or the court of appeals first issues a COA. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (characterizing a COA as a "jurisdictional prerequisite" without which "federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners"); *Neville v. Dretke*, 423 F.3d 474, 478 (5th Cir. 2005). In deciding whether to grant a COA, the Supreme Court has emphasized that a "court of appeals should limit its examination to a threshold inquiry into the underlying merit of [the petitioner's] claims." *Miller-El*, 537 U.S. at 327 (citing *Slack v. McDaniel*, 529 U.S. 473, 481 (2000)). "This threshold inquiry does not require full consideration of the

factual or legal bases adduced in support of the claims.  In fact, the statute forbids it."  *Id.* at 336.

We will only issue a COA "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  In order to satisfy this standard, Reyes must establish that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  *Id.* at 336.  While the issuance of a COA "must not be pro forma or a matter of course," a petitioner meets the burden under § 2253(c) by "demonstrat[ing] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.* at 337–38. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338.  Lastly, any doubt as to whether a COA should issue in a death-penalty case must be settled in favor of the petitioner. *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004); *Newton v. Dretke*, 371 F.3d 250, 254 (5th Cir. 2004).

In deciding whether the district court's denial of Reyes's

petition was debatable, we recognize the deferential standard of review that the AEDPA requires a district court to apply when considering a petition for habeas relief. *See Brown v. Dretke*, 419 F.3d 365, 371 (5th Cir. 2005) ("With respect to the review of factual findings, AEDPA significantly restricts the scope of federal habeas review."); *see also Miniel v. Cockrell*, 339 F.3d 331, 336 (5th Cir. 2003). Under the AEDPA, a federal court must not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the court determines that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court's decision is contrary to Supreme Court precedent if: (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law"; or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (opinion of O'Connor, J.) (interpreting and explaining the statutory language "contrary to, or involved an unreasonable application of"). "A state court's decision is an unreasonable application of clearly established federal law whenever the state court identifies the correct

governing legal principle from the Supreme Court's decisions but applies that principle to the facts of the prisoner's case in an objectively unreasonable manner." *Young v. Dretke*, 356 F.3d 616, 623 (5th Cir. 2004) (internal quotation marks omitted); *accord Williams*, 529 U.S. at 409. "An unreasonable application may also occur if 'the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Young*, 356 F.3d at 623 (alteration in original) (quoting *Williams*, 529 U.S. at 407).[1]

"[A] determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addition to explicit findings of fact, the presumption of correctness also attaches to "unarticulated findings

---

[1] Reyes contends that the district court should not have afforded deference to the state habeas court's determination because the district court decided that the state court's application of law was objectively reasonable on different grounds than those used by the state court. However, § 2254's deferential standard applies because "[t]he statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001). In addition, "there is no reason for a court deciding an ineffective assistance claim ...to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. 668, 697 (1984). Hence, regardless of whether the state habeas court had provided no reasons or unsatisfactory ones, "authority under AEDPA is still limited to determining the reasonableness of the ultimate decision." *Santellan*, 271 F.3d at 193.

which are necessary to the state court's conclusions of mixed law and fact." *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir. 2001)). A writ of habeas corpus may issue if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

**B.    Evidentiary Hearing.**

Before we address whether reasonable jurists would find it debatable that Reyes received effective assistance of counsel, we consider Reyes's assertion that the district court erred by not holding an evidentiary hearing on his IAC claim. Based on our review of the record, it is arguable that Reyes did not properly preserve this issue in district court.[2] While Respondent does not claim that this narrow issue is raised for the first time on appeal, "we, not the parties, select the appropriate standard of review, including whether an issue will even be addressed if not raised in district court." *Guidry v. Dretke*, 397 F.3d 306, 319 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1587(2006).

---

[2] Reyes only tersely mentioned the issue in his supplemental brief to the district court. Out of an abundance of caution, we will address Reyes's procedural concern which serves as a precursor to our discussion of his IAC claim for a COA. However, a COA is not required to review whether the district court erred by not granting Reyes an evidentiary hearing because that decision was neither made by a state court nor does it seem to otherwise fall within the underlying deference framework required by AEDPA.

-14-

The district court's decision to not grant an evidentiary hearing is reviewed for abuse of discretion. *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998). The court found that a hearing was not required because Reyes did not demonstrate any factual dispute whose favorable outcome would have entitled him to relief, and each of his claims could be resolved by reference to the state court record. Neither in the district court nor in this court did Reyes attempt to satisfy the statutory requirements that would justify an evidentiary hearing.

Under 28 U.S.C. § 2254(e)(2), an applicant who has failed to develop the factual basis of a claim in the state habeas court may not obtain an evidentiary hearing in federal habeas proceedings unless two conditions are met. First, the petitioner's claim must rely on a new rule of constitutional law, or on a factual predicate that could not have been previously discovered through the exercise of due diligence. 28 U.S.C. § 2254(e)(2)(A)(ii). Second, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). However, these requirements do not work against a petitioner unless the petitioner's failure to develop facts was due to "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Dowthitt v. Johnson*, 230 F.3d 733, 758

-15-

(5th Cir. 2000)(quoting *Williams*, 529 U.S. at 432), *cert. denied*, 532 U.S. 915 (2001). This determination depends on "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435.

The district court acknowledged that while at least one of Reyes's federal habeas attorneys also represented him in state habeas proceedings, federal habeas counsel did not provide an explanation for failing to submit an affidavit from the mitigation investigator to the state habeas court or any information regarding trial counsel's strategy at the punishment phase to either the state court or the district court. However, even assuming that Reyes made a reasonable attempt to investigate and pursue his claims in the state habeas court, we find that the district court did not abuse its discretion in refusing to hold an evidentiary hearing. When "[t]he district court ha[s] sufficient facts before it to make an informed decision on the merits of [the habeas petitioner's] claim" it does not abuse its discretion in failing to conduct an evidentiary hearing. *McDonald*, 139 F.3d at 1060. Moreover, we have previously expressed that "[a] full and fair hearing does not necessarily require live testimony." *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) (explaining that this Court has repeatedly stated that a paper hearing is sufficient especially where, as here, the trial court and the state habeas

court were one and the same).  Accordingly, because we conclude that the district court did not abuse its discretion by not holding a hearing on Reyes's IAC claim, we turn to Reyes's request for a COA.

**C.  Would reasonable jurists find it debatable that Reyes received effective assistance of counsel?**

Reyes seeks a COA because he contends that reasonable jurists could debate whether his Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated.  Specifically, Reyes argues that trial counsel rendered IAC by failing to investigate and to present significant mitigating evidence, including, but not limited to, evidence that he sustained substantial abuse as a child.

*Strickland v. Washington*, 466 U.S. 668 (1984), governs IAC claims.  *See Williams*, 529 U.S. at 390-91.  In order to establish IAC, a petitioner must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687-88.  The absence of either deficient performance or prejudice will defeat an IAC claim.  *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005).

Trial counsel's performance is deficient only when "representation [falls] below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  We measure reasonableness against "prevailing professional norms," viewed in light of all of the circumstances at the time of the performance.

*Id.* at 688. "Judicial scrutiny of counsel's performance is highly deferential. . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.[3]

Although "we consider it indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances[,]" *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)), counsel's failure to do so is not per se deficient performance. *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999). "[O]ur principal concern in deciding whether [defense counsel] exercised 'reasonable professional judgmen[t],' is not whether counsel should have presented a mitigation case....Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (quoting *Strickland*, 466 U.S. at 691).

The Supreme Court has referred to the American Bar

---

[3] Moreover, we have stated that courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)(quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)), *cert. denied*, 532 U.S. 915 (2001).

Association's ("ABA") standards for capital defense work as "'guides to determining what is reasonable'" *Id.* at 524 (quoting *Strickland*, 466 U.S. at 688). "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added)). However, in assessing reasonableness a court must consider whether the known evidence would lead a reasonable attorney to investigate further. *Id.* at 527. While *Strickland* does not require attorneys to investigate every possible line of mitigating evidence irrespective of its potential usefulness, or to present such evidence in every case, "'strategic choices made after less than complete investigation[s] are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* at 533 (quoting *Strickland*, 466 U.S. at 689).

Even if counsel's performance was deficient, conduct is only prejudicial if, "but for counsel's errors, there is a reasonable probability that the final result would have been different and confidence in the reliability of the verdict has been undermined." *Leal*, 428 F.3d at 548.

In the district court, Reyes alleged that his attorney's

-19-

failure to investigate and present mitigating evidence cannot be attributed to trial strategy because trial counsel did not contact an investigator to conduct an investigation into evidence for the punishment phase until the "Thursday or Friday" before the punishment phase's commencement on the following Monday. The district court reasoned that, assuming *arguendo* that trial counsel's performance was objectively deficient because a reasonably prudent attorney would have conducted an investigation into punishment before starting a capital murder trial and that Reyes has proffered mitigating evidence that was not presented at trial, Reyes still failed to demonstrate prejudice. The district court found that: (1) much of the evidence revealed to the state habeas court had already been heard by the jury; and, (2) while the aggravating evidence was as strong as the evidence in *Wiggins* and *Williams*, the two major Supreme Court cases offering guidance on how to dispose of Reyes's claim, the mitigating evidence was far weaker than the substantial abuse apparent in those cases. *See, e.g., Hood v. Dretke*, 93 F. App'x 665, 668 (5th Cir. 2004). Accordingly, the district court ultimately concluded that the state court's decision on Reyes's IAC claim was not contrary to, and did not involve, an unreasonable application of clearly established federal law. We conclude that reasonable jurists would not find it debatable that Reyes was not prejudiced by a deficient presentation of mitigating evidence.

While there was evidence that Reyes's mother neglected her home and her children, and was emotionally abusive towards Reyes, the mitigating evidence was far weaker than the substantial abuse apparent in *Wiggins* and *Williams*. In *Wiggins*, counsel failed to present evidence to the jury that: (1) Wiggins's alcoholic mother frequently left him and his siblings alone for days, forcing them to beg for food and to eat paint chips and garbage; (2) Wiggins's mother had sex with men while her children slept in the same bed and that she had once forced Wiggins's hand against a hot stove, causing him to be hospitalized; (3) Wiggins was physically abused by two foster mothers, raped by a foster father, and gang-raped by boys in another foster home; and, (4) Wiggins was sexually abused by a supervisor in his Job Corps program. *Wiggins*, 539 U.S. at 516-17. In *Williams*, counsel failed to present evidence to the jury that: (1) Williams's parents had been imprisoned for criminally neglecting Williams and his siblings; (2) Williams had been severely and repeatedly beaten by his father; (3) Williams had been placed in an abusive foster home; and, (4) Williams was borderline mentally retarded. *Williams*, 529 U.S. at 395-96.

In light of the district court's application of *Williams* and *Wiggins*, we conclude that Reyes has not established that jurists of reason could disagree with the district court's resolution of his constitutional claims or that reasonable jurists could conclude the issues presented are adequate to deserve encouragement to proceed

-21-

further.[4]  Accordingly, we deny Reyes's application for COA on his IAC claim.

### III. CONCLUSION

For the foregoing reasons, we DENY Reyes's application for a COA.  We also find that the district court did not abuse its discretion by not holding an evidentiary hearing on Reyes's IAC claim.

---

[4] We also note, as previously mentioned, that the district court acknowledged that while at least one of Reyes's federal habeas attorneys also represented him in state habeas proceedings, federal habeas counsel did not provide an affidavit (or an explanation for failing to submit one) from Reyes's trial counsel regarding his strategy at the punishment phase to either the state court or the district court.  Had an affidavit been so presented, the record would be far better developed for review.